MARY J. MORIARTY, APPELLEE, V. ROME MILLER, APPELLANT.

FILED APRIL 1, 1916.   No. 18633.

Master and Servant: INJURY TO SERVANT: ASSUMPTION OF RISK.   In
an action to recover for personal injuries sustained prior to the
passage of the workmen's compensation act (Laws 1913, ch. 198), a
woman employed to clean and scrub the floors of a café who was
thoroughly familiar with the work, and had known for a long
time that metal caps for beer bottles often fell and were found
upon the café floor, assumed the risk of injury from kneeling upon
one of such caps while in the performance of her work, and her
employer is not liable for a personal injury caused thereby.

APPEAL from the district court for Douglas county:
GEORGE A. DAY, JUDGE.   Reversed.

Edgar M. Morsman, Jr., for appellant.

Smyth, Smith & Schall, contra.

LETTON, J.

This is an action for personal injuries.  Plaintiff recov-
ered a verdict and judgment for $2,500.  Defendant ap-
peals.

The defendant is the owner of the Millard hotel in
Omaha.   The plaintiff is a scrub woman who was em-
ployed there.   She had been employed in that capacity for
about two years prior to the night of January 7, 1913.
She usually began work at midnight.   It was her duty
to scrub three cafés and other rooms, which occupied her
time until morning.   She was supplied by the housekeeper
with a pad or pillow stuffed with curled hair upon which
she placed her knees while at work.   A porter was em-
ployed, whose duty it was to sweep the rooms and pile
the chairs upon the top of the tables out of her way just
before she began to scrub.   He worked from room to room,
and she followed him.   A bar was connected with the
hotel, in which intoxicating liquors were sold.   At night,

after the bar was closed, it was the custom for beer to be served to customers in the café. The bottles of beer were stored in a refrigerator in one of the rooms and were brought by a waitress from there to the café. A hook or device was attached to a shelf or post, wherein the metal caps could be inserted and jerked from the bottles. The beer was then poured into teapots and served to the customers. This plan was pursued in order to evade the 8 o'clock closing law of the state. A cigar box was placed underneath the device in order to catch the caps as they fell.

Plaintiff testified: "Q. Did you see it before you got hurt? A. No, sir. Q. In the work that you had done there in the dining room before this, had you ever before run across these beer tops laying on the floor as you did your scrubbing? A. I often run across one, but I always avoided it. I did not see it on this night. * * * Q. Had you seen any beer tops on the floor that night prior to the time you got hurt? A. No, sir. Q. Now, you say that you had seen these beer caps on the floor there many times; now you had not seen them there very many times, had you, Mrs. Moriarty? A. I saw them very often, and I did not pay attention because they did not bother me before this. Q. You mean to say that you saw them there on the floor many times before this night that you were hurt? A. Before I was hurt? Q. Before you were hurt? A. Yes. * * * Q. Before now, when the beer caps that you say you saw on the floor, you saw them—were they always in one place or scattered about the floor? A. I did not see them scattered about the floor. I would always see them on one spot. Q. That is the place where you were hurt that night? A. Just right when I was finishing that I got hurt. Q. It was right at that same place where you were hurt? A. Yes, sure."

Her testimony is that on the night of Saturday, January 7, she was just finishing one of the rooms; that she pulled the scrub pail toward her and it spattered suds upon the floor; that she took the rag to wipe it up; that

her right knee was upon the pad, but her left knee came upon one of the beer caps, lying with the corrugations upward, which cut through her skirt, underskirt and underclothing, and cut her knee; that she took the cap from her knee and laid it upon a shelf and proceeded with her work; that this happened about a half hour or an hour after she commenced work. She testifies that, after the porter had swept the floor in this room, the waitress passed through and opened a bottle of beer on the hook; that she worked until 7 A. M., when she found that a flannel pad upon her knee was all bloody, and she had to loosen it with water, and that the print of the cap was on the knee just below the pad. The knee became sore that day. She continued to work up to Thursday night, although her knee had become greatly swollen, but was unable to finish on account of pain, and went to bed on Friday morning. The house doctor was called, and the knee was placed in a plaster cast for five or six weeks. She was confined to her bed for weeks, and when she left the hotel in July she was still obliged to use a crutch. The knee appears to be permanently partially stiffened. The testimony of the house physician, who is a son-in-law of the defendant, is that he was called on January 16, and found plaintiff with a badly inflamed knee, and that after she left the hotel in July he saw her again, and the knee was still swollen, discolored and painful, with little motion. Another physician called by plaintiff testified that he examined the leg just before the trial and found it still stiff and painful upon motion; that he was present when another physician took an X-ray picture. After having made an examination, and with the aid of the X-rays, he testified that there was a new bone formation around the cartilage and the joint, which limited the motion of the knee. The X-ray photographs were introduced in evidence. The doctor who took the photographs testified that there was a small piece of foreign matter, apparently steel or iron, in the soft tissues of the knee, close to the patella, or just below it, about the size and breadth of a carpet tack without a

head, and that the inflammation induced by the presence of this substance "would produce a chronic inflammation, probably acute at first, or if the poison kept up it would become chronic, depending on the length of time it went." He also said that the bony growths were probably caused by inflammatory conditions. The house doctor testified that when he was first called the skin was not broken, there was no scar or opening, and there was no place where any pus exuded at any time while he treated the knee.

Plaintiff produced a metal cap which she says caused the injury. It bears the name of the Metz Brewery. The evidence for the defense tended to prove that no beer had been purchased from or delivered to the Millard hotel from the Metz brewery for a long time prior to the accident. But it was not conclusively shown that a bottle of Metz Brothers beer could not have been opened in the café that night.

A number of assignments of error are made. We think it unnecessary to discuss them in detail. Her own testimony shows that Mrs. Moriarty was fully aware of the fact that beer caps were often to be found on the floor at or near the place where she says she was injured. It was the duty of the porter and her to clean and scrub these rooms. She knew that the waitress had pulled a beer cap after the porter had swept and left the room, and that it was not improbable that the cap might fall at or near the place where she was working. The proper performance of her cleaning duty seems to require that a scrub woman should look at the floor she is cleaning and pick up any waste matter or articles which have dropped on it. It seems clear to us that in scrubbing floors it is a very ordinary and common danger that tacks, pins or other foreign substances, which if knelt upon will produce injury, may have dropped upon the floor, especially in a public room such as a café. This was an ordinary risk of the employment and one which plaintiff assumed. If she had kept her knee upon the pad provided for her, the accident

would not have happened, and it is not shown it was necessary to move from it. Furthermore, the X-ray photographs clearly show a foreign body in the knee, and the medical testimony indicates that in all probability the irritation set up by this piece of metal caused the injury. An inspection of the beer cap which is in evidence fails to disclose any sharp, broken or jagged edges; the doctor who was called within a few days found no evidence of a cut; and her own sister, who saw and describes the knee as it appeared on the day after the injury, does not mention any cut.

The plaintiff's injuries are, no doubt, permanent, and she deserves the sympathy that all right-minded people feel for such a misfortune to a hard-working woman. The accident occurred before the workmen's compensation act was in effect. Under the law as it then stood and as laid down in the instructions, the jury were not warranted in finding against the defendant. Nor is this court warranted in affirming the judgment, and thus taking $2,500 of the money of defendant or his insurer for the benefit of plaintiff. Much has been said of the illegality of the conduct of defendant in selling beer after the legal hours, and, no doubt, this unlawful act had some influence with the jury. We can neither condone nor approve of this open violation of law; but, as we view the case, whether the beer was sold legally or illegally is not material.

The judgment of the district court is

REVERSED.